## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

### Case Number: 1:20cv02479

DOS BOWIES, LP, AUSTIN WALTER, ADAM
BRADEN, BARRY ETTINGER, BENJAMIN PHILLIPS,
TYC INVESTMENTS, LLC, DANNY EAPEN,
ERIC KUNTZ, GEOFFREY ALEXANDER,
HUNTER HUDSON, JOSE LLINAS, JOSEPH THAMES,
JAMES-PAUL DILL, KENNETH WALTER,
PAUL PISKLAK, RAFAL SUBERNAT,
RICHARD CAIN, ROY ABRAHAM,
RUSSELL BABBITT, RYAN KOCHEN, RIPE CAPITAL
PARTNERS LLC, STEVE NURKIN, SYED KALIM
HUSSAINI, HEESUK R. YOON, SUNIL CHERRY,
PARAG JOSHI, HITEN PATEL, NIMISH PATEL,
DAVID WEHBY, PALAM ANNAMALAI,
JASON MORRIS, MAULIK PARIKH, VENKAT IYER,
HANNIE PATEL, SHYAM KISHAN, WILLIAM HEFLIN
BARTON, III, RYAN NEUHAUS and GUPTA
BROKERAGE LLC,

|  |  |
|---|---|
|  | **COMPLAINT** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** |  |
| MICHAEL ACKERMAN, DR. QUAN TRAN,<br>and JAMES A. SEIJAS, |  |
| **Defendants.** |  |

_____/

## <u>COMPLAINT</u>

Plaintiffs Dos Bowies, LP ("**Dos Bowies**"), Austin Walter ("**Mr. A. Walter**"), Adam

Braden ("**Dr. Braden**"), Barry Ettinger ("**Dr. Ettinger**"), Benjamin Phillips ("**Dr. Phillips**"),

TYC Investments, LLC ("**TYC**"), Danny Eapen ("**Dr. Eapen**"), Eric Kuntz ("**Mr. Kuntz**"),

Geoffrey Alexander ("**Dr. Alexander**"), Hunter Hudson ("**Mr. Hudson**"), Jose Llinas ("**Dr. Llinas**"), Joseph Thames ("**Mr. Thames**"), James-Paul Dill ("**Mr. Dill**"), Kenneth Walter ("**Mr. K. Walter**"), Paul Pisklak ("**Dr. Pisklak**"), Rafal Subernat ("**Dr. Subernat**"), Richard Cain ("**Dr. Cain**"), Roy Abraham ("**Mr. Abraham**"), Russell Babbitt ("**Dr. Babbitt**"), Ryan Kochen ("**Mr. Kochen**"), Ripe Capital Partners LLC ("**Ripe Capital**"), Steve Nurkin ("**Dr. Nurkin**"), Syed Kalim Hussaini ("**Dr. Hussaini**"), Heesuk R. Yoon ("**Dr. Yoon**"), Sunil Cherry ("**Dr. Cherry**"), Parag Joshi ("**Dr. Joshi**"), Hiten Patel ("**Dr. H. Patel**"), Nimish Patel ("**Dr. N. Patel**"), David Wehby ("**Dr. Wehby**"), Palam Annamalai ("**Dr. Annamalai**"), Jason Morris ("**Dr. Morris**"), Maulik Parikh ("**Dr. Parikh**"), Venkat Iyer ("**Dr. Iyer**"), Hannie Patel ("**Dr. Patel**"), Shyam Kishan ("**Dr. Kishan**"), William Heflin Barton, III ("**Dr. Barton**"), Ryan Neuhaus ("**Dr. Neuhaus**") and Gupta Brokerage LLC ("**Gupta Brokerage**")  (collectively, "**Plaintiffs**"), by and through their undersigned counsel, hereby file this Complaint against Defendants Michael Ackerman ("**Ackerman**"), Dr. Quan Tran ("**Tran**") and James A. Seijas ("**Seijas**") (collectively, "**Defendants**").  In furtherance of the same, Plaintiffs respectfully state the following based upon personal knowledge as to their own acts, and information and beliefs as to all other matters, based upon, *inter alia*, investigation conducted by and through their counsel, which are likely to have evidentiary support after a reasonable opportunity for discovery:

## NATURE OF ACTION

1.      From at least July 2017 through December 2019 (the "**Relevant Time Period**"), Defendants, through two  entities  they  controlled,  Q3 Holdings, LLC ("**Q3H**") and Q3 I, LP ("**Q3I**") (collectively, the "**Q3 Companies**"), operated  a fraudulent scheme in which they solicited and misappropriated funds to purportedly trade virtual currencies.  Based on Defendants' misrepresentations, more than 150 investors (the "**Q3 Customers**"), including Plaintiffs, deposited at

least $33 million with the Q3 Companies.

2.      Although Defendants represented to Plaintiffs that they would use the funds to invest in cryptocurrencies, less than $10 million of the $33 million in Q3 Customer funds was wired to virtual currency exchanges.  Rather, Defendants and the Q3 Companies diverted more than $25 million of Q3 Customer funds to the personal bank accounts of Defendants.

3.      During the Relevant Time Period, Defendants received more than $3.9 million of Plaintiffs' funds.

4.      To induce Plaintiffs into making their investments, Defendants knowingly or recklessly made material misrepresentations regarding the success of Defendant Ackerman's trading, the Q3 Companies' assets, the safety of the investments, and how the Q3 Companies would utilize investor funds.

5.      Defendants told potential investors, including Plaintiffs, that they developed a proprietary trading algorithm (the "**Algorithm**") that allowed Defendants to (a) take advantage of the volatility of cryptocurrencies when trading investor funds and (b) earn profits with minimal risks.

6.      To further induce Plaintiffs and other potential Q3 Customers to invest in their scheme, Defendants knowingly and falsely represented that they were profitably trading virtual currencies and earning monthly returns of approximately 15%.

7.      In order to conceal the truth from Plaintiffs, Defendants provided Plaintiffs with false accounting statements, newsletters containing false trading returns, and fictitious screenshots reflecting the amount of money under the Q3 Companies' management.

8.      The Securities and Exchange Commission (the "**SEC**") has filed civil claims against Defendant Ackerman for securities fraud under the Securities Act of 1933 and the

Securities Exchange Act of 1934 (the "**Exchange Act**").  *See Securities and Exchange Commission v. Michael W. Ackerman*, Civil Case No.: 1:20-cv-1181.   The Commodity Futures Trading Commission (the "**CFTC**") has filed civil claims against Defendant Ackerman and the Q3 Companies for violations of the Commodity Exchange Act and Commission's Regulations (the "**CFTC Complaint**").  *See Commodity Futures Trading Commission v. Michael Ackerman, Q3 Holdings, LLC and Q3 I, LP*, Civil Case No.: 1:20-cv-1183.  In addition, the U.S. Attorney's Office for the Southern District of New York has filed its criminal complaint against Defendant Ackerman following its indictment for wire fraud and money laundering.  *See United States of America v. Michael Ackerman*, Criminal Case No.:20-cr-00093.

9.      Plaintiffs bring this action asserting violations of federal securities laws and common-law claims based on Defendants' deliberate scheme to steal millions of dollars from investors to personally enrich themselves and their families.

## PARTIES

10.      Defendant Ackerman is a resident of Alliance, Ohio.  He is a member of the management team and one of three (3) owners of Q3H, which is Q3I's general partner. Defendant Ackerman is a former registered representative of TradeStation Securities, Inc., Fortis Clearing Americas, LLC and UBS Securities, LLC.  He has held Series 7 (General Securities Representative) and 63 licenses (Uniform Securities Agent) until they lapsed in 2011. According to Q3I's private placement memorandum (the "**PPM**"), Defendant Ackerman was an institutional broker on the floor of the New York Stock Exchange for 16 years.

11.      Defendant Tran is a resident of Tampa, Florida.  He is a member of the management team and one of three (3) owners of Q3H.  Defendant Tran is a physician.

12.      Defendant Seijas is a resident of Mountain Lakes, New Jersey.  He is a member

of the management team and one of three (3) owners of Q3H.  Defendant Seijas is a former

registered representative of Wells Fargo Clearing Services, LLC.  Defendant Seijas also held,

among others, a Series 7 license (General Securities Representative) and Series 55 license

(Limited Representative-Equity Trader).

13.     Dos Bowies is an Alaska limited partnership with its principal address in

Fairbanks, AK.  In or about January 2018, through September 2019, Dos Bowies invested

$320,000 with the Q3 Companies.

14.     Mr. A. Walter resides in Glendale, AZ.  In or about December 2018, through

November 2019, Mr. A. Walter invested $110,000 with the Q3 Companies.

15.     Dr. Braden resides in Niceville, FL.  In or about December 2018, through July

2019, Dr. Braden invested $66,000 with the Q3 Companies.

16.     Dr. Ettinger resides in Hillside, NJ.  In or about January 2018, through October

2019, Dr. Ettinger invested $46,800 with the Q3 Companies.

17.     Dr. Phillips resides in Hermon, ME.  In or about August 2018, through August

2019, Dr. Phillips invested $150,000 with the Q3 Companies.

18.     TYC is a Georgia limited liability company its principal address in Atlanta, GA.

In or about December 2018, through June 2019, TYC invested $120,000 with the Q3

Companies.

19.     Dr. Eapen resides in Alpharetta, GA.  In or about March 2018, through October

2019, Dr. Eapen invested $235,001 with the Q3 Companies.

20.     Mr. Kuntz resides in Cedar Park, TX.  In or about July 2019, Mr. Kuntz invested

$50,000 with the Q3 Companies.

21.     Dr. Alexander resides in Kaneohe, HI.  In or about July 2019, Dr. Alexander

invested $50,000 with the Q3 Companies.

22.     Mr. Hudson resides in Birmingham, AL.  In or about November 2017, through August 2019, Mr. Hudson invested $137,500 with the Q3 Companies.

23.     Dr. Llinas resides in Windermere, FL.  In or about February 2018, through September 2018, Dr. Llinas invested $35,000 with the Q3 Companies.

24.     Mr. Thames resides in Homewood, AL.  In or about September 2018, through December 2019, Mr. Thames invested $60,000 with the Q3 Companies.

25.     Mr. Dill resides in Tuscaloosa, AL.  In or about January 2018, through March 2019, Mr. Dill invested $126,000 with the Q3 Companies.

26.     Mr. K. Walter resides in Fort Wayne, IN.  In or about November 2019, Mr. K. Walter invested $200,000 with the Q3 Companies.

27.     Dr. Pisklak resides in Bellaire, TX.  In or about February 2018, through March 2018, Dr. Pisklak invested $10,000 with the Q3 Companies.

28.     Dr. Subernat resides in Veazie, ME.  In or about November 2019, through July 2019, Dr. Subernat invested $232,500 with the Q3 Companies.

29.     Dr. Cain resides in Tampa, FL.  In or about December 2017, through May 2019, Dr. Cain invested $183,000 with the Q3 Companies.

30.     Mr. Abraham resides in Carmel, IN.  In or about May 2018, through December 2018, Mr. Abraham invested $100,000 with the Q3 Companies.

31.     Dr. Babbitt resides in Westport, MA.  In or about August 2019, Dr. Babbitt invested $75,000 with the Q3 Companies.

32.     Mr. Kochen resides in Atlanta, GA.  In or about June 2017, through October 2019, Mr. Kochen invested $120,000 with the Q3 Companies.

33.     Ripe Capital is a Texas limited liability company its principal address in Houston, TX.  In or about April 2018, through December 2018, Ripe Capital invested $31,000 with the Q3 Companies.

34.     Dr. Nurkin resides in Buffalo, NY.  In or about March 2018, through August 2019, Dr. Nurkin invested $50,000 with the Q3 Companies.

35.     Dr. Hussaini resides in Manassas, VA.  In or about October 2019, Dr. Hussaini invested $100,000 with the Q3 Companies.

36.     Dr. Yoon resides in Johnson City, TN.  In or about January 2018, through December 2018, Dr. Yoon invested $31,500 with the Q3 Companies.

37.     Dr. Cherry resides in Lufkin, TX.  In or about January 2018, through December 2018, Dr. Cherry invested $81,300 with the Q3 Companies.

38.     Dr. Joshi resides in Dallas, TX.  In or about January 2018, through January 2019, Dr. Joshi invested $24,500 with the Q3 Companies.

39.     Dr. H. Patel resides in Tampa, FL.  In or about July 2017, through December 2018, Dr. H. Patel invested $171,000 with the Q3 Companies.

40.     Dr. N. Patel resides in McKinney, TX.  In or about October 2018, through December 2018, Dr. N. Patel invested $31,500 with the Q3 Companies.

41.     Dr. Wehby resides in Grafton, WI.  In or about January 2018, through May 2018, Dr. Wehby invested $20,000 with the Q3 Companies.

42.     Dr. Annamalai resides in Friendswood, TX.  In or about December 2018, Dr. Annamalai invested $350,000 with the Q3 Companies.

43.     Dr. Morris resides in Virginia Beach, VA.  In or about May 2019, through July 2019, Dr. Morris invested $100,000 with the Q3 Companies.

44.     Dr. Parikh resides in Colleyville, TX.  In or about October 2019, Dr. Parikh invested $100,000 with the Q3 Companies.

45.     Dr. Iyer resides in Virginia Beach, VA.  In or about July 2019, through August 2019, Dr. Iyer invested $75,000 with the Q3 Companies.

46.     Dr. Patel resides in Odessa, FL.  In or about December 2018, Dr. Patel invested $35,000 with the Q3 Companies.

47.     Dr. Kishan resides in Plano, TX.  In or about January 2018, through October 2019, Dr. Kishan invested $134,313 with the Q3 Companies.

48.     Dr. Barton resides in Tuscaloosa, AL.  In or about January 2018, through February 2018, Dr. Barton invested $30,000 with the Q3 Companies.

49.     Dr. Neuhaus resides in Tampa, FL.  In or about December 2018, Dr. Neuhaus invested $50,000 with the Q3 Companies.

50.     Gupta Brokerage is a Wyoming limited liability company its principal address in Memphis, TN.  In or about July 2019, through August 2019, TYC invested $100,000 with the Q3 Companies.

## RELEVANT NON-PARTIES

51.     Q3H is a Delaware limited liability company Defendants formed on June 10, 2018, to act as Q3I's general partner.  Each Defendant is a managing member of and owns 33.3% of Q3H.

52.     Q3I is a Delaware limited partnership formed on July 27, 2018.[1]  Q3H is Q3I's general partner.  According to Q3I's limited partnership agreement, Defendants formed Q3I for

---

[1] A search of the State of Delaware's Department of State-Division of Corporations' website reveals that Q3I was organized on July 27, 2018.  However, the Q3I Agreement (defined herein) states that Q3I was organized on November 1, 2018.

the purpose of investing in cryptocurrencies.

53.     Q3 Trading Club ("**Q3 Club**") is a trading club that Defendants created in or around June 2017, when they deposited $15,000 of their personal funds into a trading account for the purpose of trading cryptocurrencies.  Their investment strategy purportedly involved an algorithmic trading strategy created and employed by Defendant Ackerman.  Approximately one month later, Q3 Club began seeking investors through Facebook and word of mouth.

## JURISDICTION AND VENUE

54.     This Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of New York because Defendants have transacted business within the State, including acts in furtherance of the fraudulent scheme at issue in this litigation, and have committed tortious acts within the State.  In particular, Defendants instructed Plaintiffs to transfer funds into a bank account held in the name of Q3I at Signature Bank in New York, New York.  Defendants were each authorized signers on the Q3I Signature Bank account and upon receipt of the Q3 Customers' funds, Defendants transferred these funds to other accounts controlled by Defendants.

55.     This Court has subject-matter jurisdiction over the securities fraud claims under 28 U.S.C. § 1331 and 15 U.S.C. § 78j(b) and over the related state-law claims under 28 U.S.C § 1367.

56.     Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Among other things, Defendants utilized a bank in this District to trade virtual currencies.

## FACTS

### a.  Q3 Trading Account

57.     In approximately June 2017, Defendants created the Q3 Club to trade cryptocurrencies based on Defendant Ackerman's purportedly successful Algorithm.

58.     In July 2017, Defendants began seeking investors in the Q3 Club through Facebook and word of mouth.

59.     Specifically, Defendant Tran, who is a surgeon, was a member of a private Facebook group called the "Physicians Dads Group" (the "**PD Group**").[2]  All or substantially all of the members of the PD Group were physicians.  In at least one July 2017 post in the PD Group, Defendant Tran explained that he had joined a club in which members pooled their funds to trade cryptocurrencies and offered to explain the investment strategy to any member of the PD Group, upon request.  Subsequent to the PD Group, Defendant Tran created the Facebook group called PDG Crypto Group, which was later called the Q3 LP where Plaintiffs discussed specifics about the Q3 Companies investments with Defendants and Defendant Tran posted brokerage statements containing false monthly returns.

60.     Defendant Seijas told investors, including Plaintiffs, that they were entitled to 50% of any trading profits, and that he, Defendant Tran, and Defendant Ackerman were entitled to the other 50%.

61.     The cryptocurrency was then sent to an offshore digital currency trading platform incorporated in the British Virgin Islands where Defendant Ackerman opened a trading account in late 2017 (the "**Q3 Trading Account**").

---

[2] Plaintiffs Dos Bowies, Gupta Brokerage, Dr. Ettinger, Dr. Eapen, Dr. Pisklak, Dr. Subernat, Dr. Abraham, Dr. Babbitt, Dr. Joshi, Dr. Nurkin, Dr. Wehby, Dr. Annamalai, Dr. Morris, and Dr. Parikh were members of the PD Group.

62.     By January 2018, Defendant Ackerman was directing all of the Q3 Club's trading through the Q3 Trading Account.

63.     New investors, including Plaintiffs, were directed to wire their capital contributions to Q3I to a Signature Bank account located at 565 Fifth Avenue in New York, New York.

**b.   The Q3I Offering**

64.     On or about July 27, 2018, Defendants formed Q3I.

65.     From no later than November 1, 2018, until at least December 2019, Defendants offered investors, including Plaintiffs, the opportunity to invest in limited partnership interests in Q3I.

66.     Defendants marketed the Q3I investment by providing potential investors with a PPM, a limited partnership agreement ("**Q3I Agreement**"), and a subscription agreement.

67.     The PPM, dated November 1, 2018, provided that Q3I was seeking up to $15 million in investor contributions.  According to the PPM, Q3I would use investor funds to invest in cryptocurrencies using "proprietary high velocity trading software in a methodically risk mitigating fashion. . ."

68.     The PPM also represented to investors that over the course of the prior 24 months, Q3H had "successfully traded various crypto currencies through various crypto exchanges using proprietary algorithmically driven software for other pooled investment groups."

69.     According to the PPM, Q3I would use the Algorithm and the trading experience of Q3H's management (Defendants Ackerman, Tran and Seijas) to generate trading profits.

70.     Pursuant to the terms of the Q3I Agreement, the minimum investment in Q3I is

$50,000 and investors may make additional investments of at least $20,000.

71.     By December 2019, the Q3 Companies had raised at least $33 million from more than 150 investors located throughout the United States, including Plaintiffs.

**c.  Defendants' Misrepresentations**

72.     Defendants engaged in fraudulent conduct in connection with the offering described herein.

73.     During the Relevant Time Period, Defendants told prospective investors, including Plaintiffs, that the Q3 Companies' virtual currency trading was consistently profitable and that the Q3 Companies' money under management continued to grow.

74.     During the Relevant Time Period, Defendants provided Plaintiffs with fraudulent account statements that contained fictitious account balances and monthly totals.

75.     During the Relevant Time Period, Defendants presented Plaintiffs with fraudulent screenshots of the Q3 Companies' purported trading.  These fraudulent screenshots indicated that the Q3 Trading Account had grown to more than $200 million.  In truth, the Q3 Trading Account never had more than $6 million.

76.     During the Relevant Time Period, Defendants fraudulently misrepresented to Plaintiffs that the money in the Q3 Trading Account was safe because 70% of the funds in the Q3 Trading Account were kept in cash at all times and 30% was used to trade.

77.     Knowing that Defendants Tran and Seijas would share the information with the Q3 Customers, including Plaintiffs, Defendant Ackerman advised Defendants Tran and Seijas that there were controls in place to protect the dissipation of investor funds.  Defendants represented to Plaintiffs that Defendant Ackerman could not transfer funds into or out of the Q3 Trading Account without authorization from Defendants Tran or Seijas.  Defendants knew this

representation was false since only Defendant Ackerman had log-in credentials for the Q3 Trading Account.

78.     Moreover, during the Relevant Time Period, Defendant Tran posted the aforementioned misstatements to the PD Group, PDG Crypto and/or Q3 LP group on Facebook and disseminated the same to Plaintiffs.

79.     In or about late 2019, during a dinner in Tampa, Florida, Defendant Seijas knowingly made the following false statements and material omissions to Plaintiff Dos Bowies that was present at the event through its general partner, Andrew Walter ("**Mr. Walter**"), in order to conceal Defendants' fraudulent scheme:

     a.   "On average we make about 0.5% daily on invested income.  Yes you read that correctly.  And that amount is compounded continuously as profit is made."

     b.   "[W]e can offer tremendous returns of roughly 15% a month with precise and limited risk."

     c.   "We make roughly 13-15% total profit for each month.  This has been a consistent pattern over the last six months."

     d.   "Profits are continuously reinvested thus compounding continuously.  These returns have been consistent since August 2017."

     e.   "50% return on your profit at [the] end of each fiscal year.  The General Partners – myself and the other two founders take 50% of all profit."

     f.   "There are a few costs of operations (minor salaries, an office, licensing fees and other costs)."

     g.   "The algos are right about 75% of the time and wrong 25%.  So we make

much more money than we lose."

h. "It's much less risky than buying and holding a coin that could go to zero."

i. "Luckily the algos are correct in predicting the direction of momentum for a coin 75% of the time – I'll take that in Vegas any day.  We end up losing on 1 of 4 trades.  Nets us positive everyday."

j. "In fact we haven't had a negative day in 6 months!"

k. "[B]y having a mathematically guaranteed loss ratio that is below 25%, we can guarantee winning trades as long as there is volatility in the marketplace."

l. "[W]e have mathematically determined a strategy that allows us to gain more than we lose in any life cycle."

m. "We continue to remain spot on with our programming, continual enhancements and ratio goals. What started out with an eye towards a great way to make a little money has quickly manifested into a longer-term proposition."

n. "It's been a winning strategy that has been tested through every peak and trough of this market over the last two years without failing."

o. "Algorithms are managed 24/7 by our chief trading officer, Michael Ackerman."

80.    In addition, Defendant Seijas spoke to Mr. Walter directly at the same dinner and stated that he would be in charge of trading the cryptocurrencies in the Q3 Trading Account when Defendant Ackerman was not available.  This statement was false since Defendant Seijas was aware that only Defendant Ackerman had log-in credentials for the Q3 Trading Account.

81.     At the time Defendant Seijas made these statements, he was aware that Mr. Walter would be passing the aforementioned misstatements along to other Q3 Customers, including the PD Group, Plaintiffs, and other potential investors.

82.     During the Relevant Time Period, Defendants also drafted and forwarded false email messages addressed to Plaintiffs knowingly misrepresenting profits of 15% or more. Defendants knew these statements were false because Defendants knew that only a fraction of the $33 million of investors' funds were invested in cryptocurrencies.

### d.  Defendants' Misappropriation of Plaintiffs' Funds

83.     During the Relevant Time Period, Defendants received in excess of $3.9 million from Plaintiffs.  Plaintiffs deposited funds into Q3I's Signature Bank Account in New York.

84.     During the Relevant Time Period, Defendants misappropriated the majority of Plaintiffs funds for improper and unauthorized uses in order to enrich themselves through the purchase of homes, cars, and other luxury items.

85.     From no later than April 2018, through at least November 2019, Defendants paid themselves at least $4 million of investors' funds, including Plaintiffs' funds, as purported licensing fees based on the Q3 Companies' use of the Algorithm.

86.     However, Defendants were not entitled to licensing fees (which were not adequately disclosed to investors, including Plaintiffs) since the majority of the investors' funds, including Plaintiffs' funds, were never invested in cryptocurrencies and were, therefore, not exposed to the algorithmic trading strategy.

87.     In addition, Defendants never disclosed any of the licensing fees they collected prior to November 2018.

88.     In November 2018, the PPM and Q3I Agreement disclosed for the first time that licensing fees could be charged.

89.     The Q3I Agreement stated that the limited partners shall pay for "any and all software licensing fees payable to the [general partner, Q3 Holdings]."

90.     The PPM provided that: (1) the limited partners "will leverage a nonexclusive license from the [general partner, Q3 Holdings] to a proprietary algorithmic trading solution, focused on crypto currencies, and a unique battery of informational data points to effectuate short, positional, swing trades on a high frequency, high risk mitigation basis," (2) the limited partners shall pay "software licensing fees and expenses," and (3) "[a]ctual realized fees and expenses of the GP, as well as any employment or licensing contracts, can be reviewed at the investors request."

91.     The statements in the PPM and Q3I Agreement failed to fully disclose to Plaintiffs the true nature of the licensing fees, including the costs associated with the licensing fees, the methodology that would be used to calculate the licensing fees, and when the licensing fees would be assessed.

92.     Additionally, in December 2018, Defendants agreed amongst themselves that, if Q3I reached 15% monthly profitability, then they would be entitled to any excess over the 15% threshold.  However, Defendants never disclosed this agreement to Plaintiffs.

93.     During the Relevant Time Period, Defendants directed Plaintiffs to transfer funds into bank accounts controlled by or operated for the benefit of Defendants.

94.     For example, Defendants instructed Plaintiffs to transfer funds into a bank account held in the name of Q3I at Signature Bank in New York, New York.  Defendants were each authorized signers on the Q3I Signature Bank account.

95.     Upon receipt of the Q3 Customers' funds, Defendants transferred these funds to other accounts controlled by Defendants.

96.     As signers on the Q3I Signature Bank account, Defendants Tran and Seijas knew that their authorization was not required for any fund transfers.  However, Defendants Tran and Seijas represented to Plaintiffs that their funds could not be moved to any unauthorized account or location without all three (3) of Defendants' authorization.

97.     In addition, to the extent other Q3 Customers received any purported investment redemptions from Defendants, those purported redemptions actually consisted of funds Defendants misappropriated from other Q3 Customers in the manner of a classic Ponzi scheme.

98.     Defendants Tran and Seijas had direct knowledge that sufficient funds were not available to honor Q3 Customers' redemption requests without utilizing other investor's funds in a manner consistent with a classic Ponzi scheme, which also provided them with direct knowledge that Defendant Ackerman's representations about the available funds in the Q3 Companies' accounts and the safety of the investments were false.

99.     Regardless of such knowledge, Defendants Trans and Seijas continued to knowingly participate in the fraudulent scheme.

<b>FIRST CAUSE OF ACTION</b><br><b>Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c)</b><br>(Against Defendants Ackerman and Tran)

100.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 99 as if fully set forth herein.

101.     By reason of the conduct described above, Defendants Ackerman and Tran, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails, or of any facility or any national

securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities, such as Plaintiffs. (*See*, *e.g.*, ¶¶ 2, 4, 5, 6, 7, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 91, 92, 93, 95, 96, 97, 98 and 99).

102.   Defendants Ackerman and Tran, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce or the mails, or of any facility or any national securities exchange, made materially false and misleading statements and omissions of material fact to deceive Plaintiffs, as alleged herein, and engaged and participated in a continuous course of conduct to conceal adverse material information about the scheme described herein, which operated as a fraud and deceit upon investors, including Plaintiffs. Defendants Ackerman and Tran are sued as primary participants in the wrongful conduct alleged herein.

103.   Defendants Ackerman and Tran had actual knowledge of the misrepresentations and omissions of material facts set forth herein and participated in the creation, development and issuance of the materially false and misleading statements alleged herein, and/or were aware of the other Defendants' dissemination of information to Plaintiffs that they knew was materially false and misleading.  Defendants Ackerman and Tran's material misrepresentations were done knowingly, or recklessly, and for the purpose and effect of concealing the truth with respect to the nature of the Ponzi scheme, including the use of investor funds.

104.    As the managing and controlling members of Q3I's general partner, Defendants Ackerman and Tran had a fiduciary duty to the limited partners of Q3I (i.e., the Q3 Customers, including Plaintiffs).  The Q3 Customers, including Plaintiffs, were entitled to know of the matters Defendants Ackerman and Tran failed to disclose, including the true use of Plaintiffs' funds as described herein and the actual profitability of cryptocurrency trading in the Q3 Trading Account.

105.    Defendants Ackerman and Tran concealed that Defendants were not investing all of Plaintiffs' funds in cryptocurrencies as promised.  Defendants Ackerman and Tran did not advise Plaintiffs that they were using Plaintiffs' investment funds to pay back prior investors and enrich themselves.

106.    Plaintiffs relied on Defendants Ackerman and Tran's misrepresentations in making their decisions to invest, including, but not limited to, Defendant Ackerman and Tran's misstatements regarding (i) the Q3 Companies' assets, (ii) the safety of the investments, (iii) profitably trading virtual currencies earning monthly returns of approximately 15%, and (iv) the business model for the investments, as described by Defendants Ackerman and Tran orally and in e-mails or the PD Group.  (*See* ¶¶ 4, 6, 68, 69, 73, 77, 91, 92, 97 and 98).

107.    Defendants Ackerman and Tran employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of the accuracy of the Algorithm and 15% monthly return rate.  At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth regarding the cryptocurrency accounts and that their funds would be used in a classic Ponzi scheme, Plaintiffs would not have invested.

108. As a direct and proximate result of Defendants Ackerman and Tran's wrongful conduct, Plaintiffs have suffered damages in connection with the loss of their investments and are entitled to damages.

109. By reason of the conduct described above, Defendants Ackerman and Tran violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CAUSE OF ACTION
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)
(Against Defendant Seijas by all Plaintiffs)

110. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 109 as if fully set forth herein.

111. By reason of the conduct described above, Defendant Seijas, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mails, or of any facility or any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities, such as Plaintiffs. (*See*, *e.g.*, ¶¶ 2, 4, 5, 6, 7, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 91, 92, 93, 95, 96, 97, 98 and 99).

112. Defendant Seijas, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce or the mails, or of any facility or any national securities exchange, made materially false and misleading statements and omissions of material

fact to deceive Plaintiffs, as alleged herein, and engaged and participated in a continuous course of conduct to conceal adverse material information about the scheme described herein, which operated as a fraud and deceit upon investors, including Plaintiffs.  Defendant Seijas is sued as a primary participant in the wrongful conduct alleged herein.

113.    Defendant Seijas had actual knowledge of the misrepresentations and omissions of material facts set forth herein and participated in the creation, development and issuance of the materially false and misleading statements alleged herein, and/or was aware of the other Defendants' dissemination of information to Plaintiffs that he knew was materially false and misleading.  Defendant Seijas was also aware that Dos Bowies would share the misstatements with other Q3 Customers, including Plaintiffs.  In addition, Defendant Seijas' failures to correct any misstatements or omissions were done knowingly, or recklessly, and for the purpose and effect of concealing the truth with respect to the nature of the Ponzi scheme, including the use of investor funds.

114.    As a managing and controlling member of Q3I's general partner, Defendant Seijas had a fiduciary duty to the limited partners of Q3I (i.e., the Q3 Customers, including Plaintiffs).  The Q3 Customers, including Plaintiffs, were entitled to know of the matters Defendant Seijas failed to disclose, including the true use of Plaintiffs' funds as described herein, the actual profitability of cryptocurrency trading in the Q3 Trading Account and the safety of the investments.

115.    Defendant Seijas concealed that Defendants were not investing all of Plaintiffs' funds in cryptocurrencies as promised.  Defendant Seijas did not advise Plaintiffs that Defendants were using Plaintiffs' investment funds to pay back prior investors and enrich themselves.

116.    Plaintiffs relied on Defendant Seijas' misrepresentations in making their decisions to invest, including, but not limited to, Defendant Seijas' misstatements regarding (i) the Q3 Companies' assets, (ii) the safety of the investments, (iii) profitably trading virtual currencies earning monthly returns of approximately 15%, and (iv) the business model for the investments, as described by Defendant Seijas orally and through Plaintiff Dos Bowies' innocent dissemination to Plaintiffs and the PD Group.  (*See* ¶¶ 4, 6, 60, 69, 77, 79, 80 and 81).

117.    Defendant Seijas employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of the accuracy of the Algorithm and 15% monthly return rate.  At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth regarding the cryptocurrency accounts and that their funds would be used in a classic Ponzi scheme, Plaintiffs would not have invested.

118.    As a direct and proximate result of Defendant Seijas' wrongful conduct, Plaintiffs have suffered damages in connection with the loss of their investments and are entitled to damages.

119.    By reason of the conduct described above, Defendant Seijas violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**THIRD CAUSE OF ACTION**
**Fraudulent Inducement**
(Against Defendants by all Plaintiffs)

120.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 115 as if fully set forth herein.

121.    Defendants knowingly misrepresented to Plaintiffs that they were involved in a unique investment opportunity whereby they would pool investor funds to trade in cryptocurrencies using a purportedly successful Algorithm.

122.    Defendants knowingly misrepresented these facts orally and in writing, including misstatements regarding (i) profitably trading virtual currencies earning monthly returns of approximately 15%; (ii) the Q3 Companies' assets; (iii) the safety of the investments; (iv) the business model for all investments, as described by Defendants orally, in emails, and as written in the agreements signed by Plaintiffs; and (v) the validity and usefulness of the Algorithm.  (*See* ¶¶ 2, 4, 5, 6, 7, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 91, 92, 93, 95, 96, 97, 98 and 99).  The misrepresentations described herein were created and shown to Plaintiffs in an effort to induce Plaintiffs to invest in the Q3 Companies.

123.    Such facts were material to Plaintiffs in connection with their decisions to invest.

124.    Defendants knew that all these material misrepresentations were false at the time they communicated this information to Plaintiffs.

125.    Plaintiffs would not have invested if they had known of these material misstatements regarding the use of their funds.

126.    Plaintiffs reasonably relied on these material misstatements and omissions, based on, among other things, the explicit assurances by Defendants that their money would be pooled to invest in cryptocurrencies.

127.    Plaintiffs could not have discovered the truth of Defendants' misstatements and omissions through the exercise of ordinary diligence because the information was either kept confidential or known only by Defendants.   For example, Plaintiffs were unaware that the

majority of the funds invested were used to enrich Defendants rather than invest in cryptocurrencies under the guise of paying purported licensing fees for the Algorithm.

128.    Plaintiffs lost in excess of approximately $3.9 million in funds they invested in the Q3 Companies and were damaged as a proximate result of Defendants' fraudulent inducement.

129.    Because Defendants engaged in their fraudulent conduct willfully and maliciously, and with the intent to damage Plaintiffs, Plaintiffs are entitled to an award of damages, including punitive damages.

### FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty
(Against Defendants by all Plaintiffs)

130.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 129 as if fully set forth herein.

131.    Defendants owed a duty to Plaintiffs when they accepted Plaintiffs' investment funds pursuant to the PPM.  As the managing and controlling members of Q3I's general partner, Defendants had a fiduciary duty to the limited partners of Q3I (i.e., the Q3 Customers, including Plaintiffs).  The Q3 Customers, including Plaintiffs, were entitled to know of the matters Defendants failed to disclose, including the true use of Plaintiffs' funds as described herein and the actual profitability of cryptocurrency trading in the Q3 Trading Account.

132.    Defendants breached their duty owed to Plaintiffs by failing to invest their funds in accordance with the PPM, as described herein.

133.    As a result of Defendants' aforementioned conduct, Defendants consciously disregarded, or were willfully blind to, a substantial and unjustifiable risk that their wrongful conduct violated their fiduciary duty to Plaintiffs.

134.    As a direct and proximate cause of Defendants' breach of their fiduciary duty, Plaintiffs have incurred damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Civil Conspiracy to Commit Fraud**
(Against Defendants by all Plaintiffs)

135.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 134 as if fully set forth herein.

136.    At various times and places enumerated above, Defendants intentionally conspired to defraud Plaintiffs through the Q3I Agreement (an agreement between two or more persons) and committed a number of overt acts, as more specifically described above, in furtherance of that agreement with each Defendants' intentional participation in the furtherance of a plan or purpose to defraud Plaintiffs.  Defendants' conspiracy did in fact defraud Plaintiffs, as described above, and resulted in damages to Plaintiffs.

137.    Upon information and belief, Defendants communicated their agreement to defraud Plaintiffs, as described herein, including the misappropriation of Plaintiffs' funds, through emails and/or telephone calls between Defendants so that they could convert Plaintiffs' investment funds held in the Signature Bank account in New York for their own financial gain and enrichment at Plaintiffs' expense.

138.    As a result of Defendants' conspiracy as described herein, Plaintiffs suffered substantial harm and are entitled to actual damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**Negligence**
(Against Defendants by all Plaintiffs)

139.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 138 as if fully set forth herein.

140.     Pursuant to the above-described relationship between Plaintiffs and Defendants, Defendants owed Plaintiffs a duty to exercise reasonable care when providing investment advice and recommendations that included a duty to disclose material information regarding the cryptocurrency investments and to perform reasonable investigations into the value of the trading accounts and profitability of the investments they were recommending.

141.     Defendants breached their duties of care to Plaintiffs.

142.     As a direct and proximate result of Defendants' breaches of their duties, Plaintiffs have suffered, and will continue to suffer, substantial monetary damages.

143.     By reason therefor, Plaintiffs seek a judgment against Defendants, jointly and severally, for all damages caused by their breaches in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Conversion
(Against Defendants by all Plaintiffs)

144.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 143 as if fully set forth herein.

145.     At all relevant times, Plaintiffs continue to have rights in and are entitled to the return of their investment funds.

146.     During the Relevant Period of Time, Plaintiffs were instructed to deposit their funds in the Q3 Signature Bank account as described above.

147.     Defendants, by their wrongful acts, conspired to illegally take, and did illegally take property which was rightfully owned by Plaintiffs and converted such property for their own use and benefit.

148.     Defendants' wrongful acts included, but were not limited to (i) collecting undisclosed licensing fees, (ii) paying prior investors with Plaintiffs' funds, (iii) using a majority

26

of Plaintiffs' funds to enrich themselves by purchasing, including among other things, expensive homes, Tiffany & Co. jewelry and luxury cars.

149.    Additionally, as discussed above, Defendants undertook numerous other actions designed to loot assets which rightfully belonged to Plaintiffs for the benefit of Defendants.

150.    By reason of the foregoing, Plaintiffs have sustained damages in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
(Against Defendants by all Plaintiffs)

151.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 150 as if fully set forth herein.

152.    Defendants were unjustly enriched at Plaintiffs' expense.  Specifically, Defendants diverted all of Plaintiffs' investment funds in order to enrich themselves through the purchase of homes, cars, and other luxury items.

153.    Defendants also paid themselves at least $4 million of investors' funds, including Plaintiffs' funds, as purported licensing fees based on the Q3 Companies' use of the Algorithm.

154.    It is against equity and good conscience to permit Defendants to retain funds they diverted for their own personal use, including the paying of prior investors, in connection with Plaintiffs' investments, where they made misrepresentations regarding how Plaintiffs' funds would be invested, the monthly rate of return, and the reliability of the Algorithm, which Plaintiffs relied on in making their decision to invest.

155.    As a direct and proximate result of Defendants' wrongful diversion of Plaintiffs' investment funds, Defendants have been unjustly enriched to Plaintiffs' detriment.

156.    Accordingly, Plaintiffs are entitled to a judgment in their favor for

the full amount by which Defendants have been unjustly enriched, in an amount to be determined at trial.

## DEMAND FOR A JURY TRIAL

Under Federal Rule of Civil Procedure 38, Plaintiffs respectfully request a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment awarding Plaintiffs: (1) compensatory damages in an amount no less than $3,960,414, plus any interest accrued thereon, or to be determined at trial; (2) punitive damages in an amount to be determined at trial; and (3) any other and further relief as the Court may deem just and proper.

**DATED:**       March 20, 2020
             Coral Gables, Florida

                                    **HUNTER TAUBMAN FISCHER & LI LLC**

                                    */s/ Mark David Hunter*
                                    Mark David Hunter, Esquire
                                    New York Bar No. 4017331
                                    Jenny Johnson-Sardella, Esquire
                                    New York Bar No. 4225850
                                    2 Alhambra Plaza, Suite 650
                                    Coral Gables, Florida 33134
                                    Tel:       (305) 629-1180
                                    Fax:      (305) 629-8099
                                    E-mail:mhunter@htflawyers.com
                                             jsardella@htflawyers.com